**UNIYED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO:

DONALD BURGESS,

    Plaintiff,

v.

CHAMBER OF COMMERCE
OF THE PALM BEACHES, INC.

    Defendant,

_____/

**COMPLAINT FOR RACIAL DISCRIMINATION 42 U.S.C. §1981**

COMES NOW, Plaintiff, DONALD BURGESS, pursuant to 42 U.S.C. §1981, and sues Defendant, CHAMBER OF COMMERCE OF THE PALM BEACHES, INC. for Racial Discrimination 42 U.S.C. § 1981 and in support thereof, states as follows:

I.    INTRODUCTION

1. This is an action for relief under 42 U.S.C. §1981 that provides for relief against discrimination in employment on the basis of race. Plaintiff seeks compensatory damages, punitive damages, and equitable as well as all relief authorized by section 706(g) of the Civil Rights Act of 1964.

2. Plaintiff was forced to suffer the results of vile and repugnant racial discrimination due to being a black person while employed as the President and CEO of the Chamber of Commerce of the Palm Beaches, Inc.

II.    JURISDICTION AND VENUE

3. This Court has jurisdiction of this matter pursuant to The Civil Rights Act of 1866, which includes the principles now found in 42 U.S.C. § 1981 and the federal statute 28 U.S.C. § 1343.

4. Plaintiff has fulfilled all conditions precedent to the institution of this action.

III. PARTIES

5. Plaintiff, DONALD BURGESS (hereinafter "Burgess"), is a black male citizen of the United States, a current resident of Alaska, over the age of 18, not a member of the US Military, otherwise sui juris, and at all times pertinent was employed by the Defendant at its West Palm Beach, Palm Beach County, Florida location.

6. Defendant, CHAMBER OF COMMERCE OF THE PALM BEACHES, INC. (hereinafter "The Chamber"), is a Florida not for profit Corporation doing business in West Palm Beach, Palm Beach County, Florida.

IV. GENERAL ALLEGATIONS

7. Burgess first gained employment with The Chamber in September 2009.

8. He was hired to fill the position of Operations Coordinator (OC).

9. As the OC, Burgess was tasked with creating and maintaining operational procedures, conducting resource planning and allocation, tracking and analyzing operational data, coordinating with different departments for seamless workflow, liaising with vendors, ensuring compliance with company policies and standards, addressing any operational issues or challenges that arise, interacting with other stakeholders and more.

10. The position of OC is equivalent to that of COO (Chief Operating Officer) in other companies.

11. Burgess reported directly to Chief Executive Officer/President (CEO) in his capacity as OC of The Chamber.
12. The CEO was Dennis Grady, a white man, during the entirety of the time Burgess was employed as a OC.
13. Burgess gave his best efforts to ensure the success of The Chamber.
14. Burgess expanded the footprint of The Chamber within Palm Beach County, Florida.
15. Burgess introduced new ideas to the Chamber.
16. Burgess implemented new policies which had been developed by the board.
17. Burgess helped the CEO fulfill his role as CEO of the Chamber.
18. Burgess was able to ensure the reputational success through trying times such as the COVID pandemic of 2020.
19. Dennis Grady retired from the Chamber after 35 years with The Chamber on April 1, 2021.
20. As a result of Burgess' hard work as the OC, he was promoted to the position of Chief Executive Officer/President (CEO) reporting directly to the board of directors.
21. Dennis Grady was being paid approximately $140,000.00 annually at the time he retired and was replaced by Burgess.
22. Burgess, a black man, was put into the CEO position at $90,000.00 annually, $50,000.00 less than what Dennis Grady, a white man, was making at the time.
23. Burgess was paid 36% less than his white comparator because The Chamber is racist.
24. The Chamber did not believe that Burgess, as a black man, should be compensated the same as a white man who was similarly situated.
25. The board that hired Burgess could not envision the Chamber without Dennis Grady so they wanted Dennis Grady to have a role for their own comfort.

26. The Chamber retained the services of Dennis Grady in what can be described as a ceremonial capacity.

27. During the time Burgess served as CEO, he never sought nor received guidance from Dennis Grady.

28. Burgess never relied on Dennis Grady for information or assistance in the execution of his duties.

29. Over the three years that Burgess was CEO, he may have interacted with Dennis Grady three times and that was just to make him feel needed.

30. Burgess, as CEO, guided The Chamber to consistent and consecutive revenue increases in 2022 and 2023.

31. The Chamber had revenue of $936,659 in 2021.

32. The Chamber had revenue of $1,132,149 in 2022.

33. The Chamber had revenue of $1,208,707 in 2023.

34. Burgess performed his duties as CEO in an exemplary manner.

35. Burgess received multiple accolades and recognitions from stakeholders during his tenure as CEO of The Chamber.

36. Burgess was never admonished by the board of directors of The Chamber.

37. After more than one year had elapsed from the time Burgess was placed into the CEO position, he became concerned because he had not received a pay increase or been informed of any information indicating that he was undeserving of a pay increase from The Chamber.

38. Burgess also took note that of all of the Chamber CEOs in Palm Beach County, Florida, and even though he had a larger population, he was black and the lowest paid.

39. It is irresponsible for a board to have a CEO that is not performing and do nothing about it.
40. Burgess considered the possibility at the time that he was not receiving a pay increase because he was black and The Chamber is racist.
41. In May 2023, Mr. Burgess made inquiry to then chair, Robert Diffenderfer regarding his awareness that he was being inadequately compensated for the work he was doing on behalf of the Chamber.
42. Burgess was advised in May of 2023 that a performance assessment would have to be completed before his salary could be adjusted.
43. Burgess had to practically beg for a performance review, which finally came in April 2024.
44. During the pendency of the review, Burgess continued to excel in the performance of his duties as CEO on behalf of The Chamber.
45. The performance review from The Chamber that was received by Burgess contained no mention of performance concerns.
46. The reason for the delay was because Burgess was black and the Chamber is racist.
47. After a period of 11 months from the time Burgess was advised that a review would be required before he could receive a pay increase, Mr. Diffenderfer advised Burgess that he would receive a salary increase of $10,805.00 bringing his salary to $100,805.00.
48. Based on prior research conducted by Burgess, he recognized the offer as being inadequate for the duty requirements, prior performance, and position title he held at the time.
49. Burgess had no choice but to decline the offer and make a counteroffer.
50. Mr. Diffenderfer informed Burgess that the Chamber rejected his offer but would offer him a salary increase of $28,500.00 which would bring his salary up to $118,500.00.

51. Burgess was advised by Mr. Diffenderfer that he believed the offer was a good offer and that the Chamber was unwilling to offer him more.
52. After suffering this pervasive racial discrimination for nearly three years, Burgess informed Mr. Diffenderfer that he had no choice but to move on.
53. After Burgess announced his decision, the offer was increased to $125,000.00 which Burgess felt was not enough for him to reverse his intent to resign.
54. Burgess had no choice but to decline the offer and seek employment elsewhere.
55. Burgess was able to find employment elsewhere as a CEO at a Chamber of Commerce in Alaska.
56. The pay received by Burgess at his new place of employment was $135,000, $35,000 less than the $170,000.00 The Chamber was paying the person who was not a member of Burgess' protected class.
57. Subsequently, Burgess discovered that the Chamber hired a white male by the name of Michael Zeff to occupy the position of President and Chief Executive Officer.
58. Unconstrained by the fact that Michael Zeff was not black, The Chamber started Zeff at a salary of $170,000.00.
59. This amount is $80,000.00 more than Mr. Burgess received and $45,000.00 more than Mr. Burgess was offered to remain in the position.
60. Michael Zeff started at a 53% higher salary than Burgess because Burgess is black and The Chamber is racist.

61. Burgess endured this vile racist disparate treatment for nearly three years which was pervasive and permeated the workplace[1].

62. Burgess states that the reason he was denied a commensurate salary for his duties, performance, and position was because of his membership in the protected class of being black.

63. Burgess has suffered racial discrimination at the hands of The Chamber.

64. Burgess is suffering and will continue to suffer irreparable injury from The Chamber's unlawful policy and practice as set forth herein unless enjoined by this Court.

65. The Chamber acted with malice and/or reckless disregard towards Burgess' federally protected rights.

V.     CAUSE OF ACTION

### COUNT I – RACE DISCRIMINATION PURSUANT TO 42 U.S.C. § 1981

66. Plaintiff restates those allegations contained in paragraphs 1 through 60 as if restated in full herein.

67. A plaintiff can establish a *prima facie* case of **race discrimination** by showing, *inter alia*, that he was: (1) subject to an adverse employment action; and (2) treated less favorably than a similarly situated employee outside his protected class.

68. Burgess was employed as President/Chief Executive Officer at The Chamber of Commerce of The Palm Beaches, Inc. from April of 2021 until June of 2024.[2]

---

[1] In a disparate treatment case, "the central focus is less whether a pattern of discrimination existed [at the company] and more how a particular individual was treated, and why." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 n.11 (1st Cir. 1993) (citation omitted). Brown Distrib. Co. v. Marcell, 890 So. 2d 1227, 1230-31 (Fla. 4th DCA 2005).

[2] Under 42 USC Section 1981. In order to state a claim under 42 U.S.C.S. § 1981, a plaintiff must allege (1) intentional **racial discrimination** (2) that caused a contractual injury. A contractual injury includes any injury relating to the making, performance, modification, or termination of the contract, or to the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.S. § 1981(b). As to the first element, a plaintiff may establish **racial discrimination** directly or

69. Burgess was a member of the protected class as a member of the black race.

70. Burgess was paid lower wages than similarly situated individuals who were not members of his protected class, members of the black race.

71. Burgess was denied a performance review for nearly 24 months[3].

72. Any reason, other than Burgess being black, offered by The Chamber for paying Burgess substantially less than similarly situated non-blacks is pretextual.

73. Burgess has suffered damages as a result of the vile and repugnant racism imposed upon him by The Chamber.

WHEREFORE, the Plaintiff requests this Honorable Court enter a judgment awarding $35,000.00 actual damages, $158,333.46 back pay, $128,333.33 front pay, $50,000.00 compensatory damages, $1,000,000.00 punitive damages, interest, injunctive relief, attorneys' fees at a reasonable rate of $500.00 per hour, costs and any such other relief this Court deems just and proper.

**Jury trial is demanded on all issues so triable.**

**I hereby swear or affirm under penalty of perjury that the information given herein is true and correct to the best of my knowledge or belief.**

*Oct. 21, 2025*
Date

DONALD BURGESS
618 Auburn Drive
Fairbanks, AK 99709

/s/Christopher W. Cook
Christopher W. Cook, Esq.
FL Bar No. 0117367

---

circumstantially. For purposes of enforcement in Florida, at-will employment is considered contractual. Lawsuits under this section also allow for the recovery of attorney's fees. Ziyadat v. Diamondrock Hosp. Co., 3 F.4th 1291, 1294.

[3] a plaintiff can establish a *prima facie* case of **race discrimination** by showing, *inter alia*, that she was: (1) subject to an adverse employment action; and (2) treated less favorably than a similarly situated employee outside her protected class). Bender demonstrated two potential adverse employment actions: MSV's [**4] decisions to (1) not provide her an annual performance evaluation, raise, or bonus, and (2) assign her extra workloads. Bender v. Miami Shores Vill., 578 Fed. Appx. 822, 824.